**Daniel L. KULAVIC, Plaintiff–Appellant, Cross–Appellee,**

v.

**CHICAGO & ILLINOIS MIDLAND RAILWAY COMPANY, Defendant–Appellee, Cross–Appellant.**

Nos. 92–1707 & 92–1907.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 23, 1992.

Decided July 26, 1993.

508

John L. Swartz, Carol J. Hansen–Fines, Giffin, Winning, Cohen & Bodewes, Springfield, IL, Charles A. Collins, Collins & Ingebritson, Minneapolis, MN, Michael L. Weiner, Weiner & Kvas, St. Paul, MN, for plaintiff-appellee.

Hugh J. Graham, Dean W. Jackson, Graham & Graham, Springfield, IL, for defendant-appellant.

Before FLAUM and RIPPLE, Circuit Judges, and KAUFMAN, Senior District Judge.*

RIPPLE, Circuit Judge.

Daniel Kulavic was an employee of the Chicago & Illinois Midland Railway Company (C & IM) when he was injured on the job in a physical altercation with his supervisor. Subsequently, his employment was terminated when he failed to follow C & IM's request to report to work and, in the company's view, did not provide sufficient medical evidence to excuse his absence. Mr. Kulavic pursued relief under the Railway Labor Act (RLA), 45 U.S.C. §§ 151–188 (1988), but his termination was upheld. He then brought suit in federal court under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51–60 (1988), to recover for injuries sustained in the incident with his supervisor. The district court, however, determined that Mr. Kulavic was barred from presenting any evidence of future lost wages, benefits, and earning capacity from the date of his discharge. The court held that Mr. Kulavic was precluded from presenting the issue of these damages to the jury in his FELA action because the issue had been resolved in the RLA proceedings. 760 F.Supp. 137. Although the jury in the FELA action ultimately awarded damages to Mr. Kulavic, he moved for a new trial on damages or, in the alternative, for judgment notwithstanding the verdict and additur. The district court denied the motion and Mr. Kulavic now appeals. C & IM also appeals from several evidentiary rulings the district court made during the damages phase of trial. We reverse the judgment of the district court and remand for a new trial on damages. C & IM's cross-appeal is dismissed.

# I

## BACKGROUND

### A. *Facts*

Mr. Kulavic was employed by C & IM as a carman. While at work on August 30, 1985, Mr. Kulavic was involved in an altercation during which his supervisor physically assaulted him. Mr. Kulavic and his supervisor had disagreed over the proper method for testing air brakes on railroad cars submitted to the car department for inspection. After a heated discussion, the supervisor attacked Mr. Kulavic from behind, punching and kicking him and causing him to fall on a brake beam.[1] Mr. Kulavic was injured in this incident. Because of their conduct, C & IM temporarily suspended both Mr. Kulavic and his supervisor from duty. Suffering from injuries incurred in the attack, Mr. Kulavic consulted and began treatment with several different doctors. He was treated for abrasions to his right forearm, left arm, and left leg. Over the course of several months, he was also treated for rib pain, temporal mandibular joint dysfunction, tinnitus, and extreme nervousness, anxiety, and depression, all allegedly stemming from the altercation with his supervisor.

Mr. Kulavic's work suspension was set to terminate on January 6, 1986, but on January 2, Mr. Kulavic advised the head of his department, Hal Bast, by letter that he was still under his doctors' care and would be unable to return to work. R. 53, part 2 at Carrier's Ex. C. Mr. Kulavic informed Bast that he would advise the railroad when he was able to return. *Id.* On January 3, 1986, C & IM's general surgeon, Dr. John Meyer, examined Mr. Kulavic to determine whether he was physically capable of returning to work. Dr. Meyer also requested that Mr. Kulavic make available all medical records compiled by any doctors who had examined or treated him during his work suspension. Based on the examination and the information he received from some of Mr. Kulavic's treating physicians, Dr. Meyer had come to the conclusion, by the beginning of June 1986, that Mr. Kulavic was capable of returning to work.

Bast then notified Mr. Kulavic that he was to report for work on June 9, 1986, because

---

* The Honorable Frank A. Kaufman, Senior District Judge for the District of Maryland, is sitting by designation.

1. In a state trial, Mr. Kulavic's supervisor was found guilty of battery.

Dr. Meyer had approved him for regular work as a carman. R. 53, part 3 at B. On the appointed day, however, Mr. Kulavic did not report to work; instead, he telephoned the general car foreman and informed him that he was still sick and had not yet been released by his doctor. R. 53, part 3 at C. Bast then sent Mr. Kulavic a letter notifying him that his excuse was not valid unless

you can prove by medical evidence from a reputable physician that you are physically unable to work this date, and each date you are absent prior to your return to service. As always, final determination as to an employe's [sic] physical and mental ability to work will be made by the company physician.

We will have no alternative but to consider you absent without permission until such time as you return to work, or show by medical evidence why you cannot.

R. 53, part 3 at D. In response, Mr. Kulavic submitted to C & IM an insurance report with an attachment filled out by his physician, but the railroad determined that the document did not meet the required standard of "medical evidence from a reputable physician that you are physically unable to return to service." R. 53, section 3 at K. Thus, Mr. Kulavic's work absences could not be excused on the basis of his alleged continuing disability. On June 17, Bast advised Mr. Kulavic to report to C & IM for an investigation and hearing to

develop facts, and your responsibility, if any, in connection with your alleged failure to report for work as instructed, ... your alleged absence without permission, ... and your alleged failure to timely notify your supervisor you would be absent on June 10, 11, 12, 13, 16, and 17, 1986.

You are entitled to representation, to present witnesses in your own behalf and to examine and cross-examine any witnesses appearing at such investigation and hearing.

R. 54, part 7 at Carrier's Ex. LL.

The investigative hearing was held on July 15, 1986, on the premises of C & IM and both the Interrogator and the Hearing Officer

were railroad employees. Mr. Kulavic attended the proceedings and was represented by a union official. Mr. Kulavic's medical records and his physicians' correspondence were examined and Mr. Kulavic was allowed to present his case to the railroad.

Ten days later, the Hearing Officer sent Mr. Kulavic a letter detailing the findings of the investigation and informing Mr. Kulavic that C & IM had terminated his employment. The Hearing Officer concluded that none of the evidence presented at the investigation served to excuse Mr. Kulavic's work absence; Mr. Kulavic had failed to present sufficient medical evidence of his inability to return to work. R. 54, part 5.

Pursuant to the procedures dictated by the RLA, Mr. Kulavic appealed his dismissal to a Public Law Board (PLB). He claimed that the railroad had violated the collective bargaining agreement (CBA) by unfairly dismissing him, and he alleged that the railroad's investigation had been improper and unjust. Thus, Mr. Kulavic submitted that his employment should be restored to him and his wages and all other benefits, plus interest, should be granted to him as relief. R. 55, part 8 at 1. A majority of the PLB, however, found no reason to interfere with the railroad's termination of Mr. Kulavic's employment.[2] The PLB stated:

Upon review, we find that the investigation was conducted in a fair and impartial manner. None of claimant's agreement rights was violated. We have considered the objections of the Organization and do not find them of sufficient significance to invalidate the proceedings.

Substantial evidence was adduced in the investigation in support of the charge against claimant. There was no evidence presented in the investigation that claimant was being withheld from Carrier's service by any doctor. It is clear from the record that claimant was attempting to substitute his personal opinion as to his ability to return to work for the professional opinions of the several medical doctors involved.

2. The labor member of the PLB dissented from     the majority's award.

*Id.* at 4. Thus, the PLB denied Mr. Kulavic's claim and upheld the railroad's termination. Mr. Kulavic did not appeal from the award.

B. *District Court Proceedings: The FELA Action*

On August 3, 1986, Mr. Kulavic filed an action in federal court alleging liability against C & IM under the FELA. *See* 45 U.S.C. §§ 51–60. Mr. Kulavic sought redress for the injuries he had sustained in the altercation with his supervisor. Mr. Kulavic claimed that C & IM had negligently caused, at least in part, his numerous injuries. The district court bifurcated the trial into a liability phase and a damages phase. In the liability phase, the jury found C & IM eighty-five percent negligent and Mr. Kulavic fifteen percent negligent for his injuries. Thus, the railroad was responsible for eighty-five percent of any damages that the jury might award to Mr. Kulavic in the second phase of trial.

Prior to trial on liability, C & IM had filed a motion in limine seeking to bar Mr. Kulavic from seeking lost earnings, fringe benefits, and loss of earning capacity from the date of his discharge onward. C & IM argued that these damages had already been addressed and resolved by the PLB when it reviewed the railroad's dismissal of Mr. Kulavic. The district court agreed and granted the railroad's motion. However, after the jury brought back the negligence allocations, but prior to trial on damages, the district court revisited the issue of the preclusive effect of the PLB's decision. Because the court believed the question to be both important to the litigation and novel, it ordered the parties to submit supplemental briefs on the issue.

On April 2, 1991, the district court again ruled that the PLB's decision precluded the availability of some of Mr. Kulavic's alleged economic damages in the FELA claim. R. 95, Mem. Op. at 10. The court found that, in the course of the PLB's review of the railroad's investigatory hearing, the PLB had examined Mr. Kulavic's medical records and physicians' reports and had determined that Mr. Kulavic was physically capable of returning to work. According to the court, this determination required a conclusion that Mr.

Kulavic had no right to future wages and compensation for loss of earning capacity because he was able to return to work. Allowing Mr. Kulavic to argue to the jury that he had lost wages, benefits, and earning capacity subsequent to his termination would, the district court concluded, nullify the PLB's decision, thus ignoring the finality such decisions are given by the RLA. *See* 45 U.S.C. § 153 First (m) and 153 Second. Additionally, the district court stated that giving the PLB decision preclusive effect in a subsequent FELA action did not deny Mr. Kulavic his statutory right to redress his injuries, Mem. Op. at 10; Mr. Kulavic was allowed to present to the jury evidence regarding past and future medical bills, pain and suffering, disability resulting from injury, and lost earnings between the time of injury and the date of discharge. Thus, the court held that compensation under the FELA was not entirely foreclosed.

Subject to C & IM's motion in limine, the damages phase of Mr. Kulavic's case was tried to the jury. The jury awarded $75,000 in damages, $63,750 of which was the responsibility of the railroad. Both parties then submitted post-trial motions. Mr. Kulavic moved for a new trial on damages or, in the alternative, judgment notwithstanding the verdict and additur. C & IM also moved for a new trial on damages or, in the alternative, to alter or amend the judgment to reflect certain setoffs and liens. The district court denied all of the motions and both parties now appeal. Mr. Kulavic contends that the district court erred when it prohibited him from presenting certain economic damages to the jury. He asserts that determinations made pursuant to RLA-mandated arbitration should not be given preclusive effect in a separate FELA action. In its cross-appeal, C & IM raises several alleged evidentiary errors made by the district court in the damages phase of trial and contends that certain set-offs should have been assessed against the amount of damages awarded Mr. Kulavic.

II

ANALYSIS

Mr. Kulavic acknowledges that, under the RLA, the PLB's award regarding his dis-

missal is final and binding. *See* 45 U.S.C. § 153 First (m) and 153 Second (both provisions stating that "awards shall be final and binding on both parties to the dispute"). Mr. Kulavic also makes clear that he is not attempting to relitigate a wrongful discharge claim in the FELA action. Although he does not agree with the decision of the PLB, he acknowledges that he cannot relitigate the question of whether his discharge was wrongful and violative of the CBA. Instead, Mr. Kulavic states that he brought the FELA suit to recover for the alleged injuries he sustained in the altercation with his supervisor. He denies that the injuries he is claiming are related to his discharge. Relying extensively on *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), Mr. Kulavic argues that the award by the PLB should not be given preclusive effect over federal statutory rights embodied in the FELA.

C & IM, however, emphasizes that awards made by the PLB are final and binding on both parties to the dispute. It states that an issue resolved under the RLA cannot be relitigated in a separate judicial forum. Congress intended that decisions rendered under the RLA be final and, according to C & IM, allowing relitigation under the FELA would frustrate that intent. Moreover, C & IM contends that the district court's decision regarding preclusion did not eliminate Mr. Kulavic's right to recovery under the FELA. The court disallowed only a portion of Mr. Kulavic's alleged damages, while allowing the jury to consider the rest. Thus, C & IM believes the district court correctly respected the finality of the PLB's award by finding that Mr. Kulavic was precluded from asking the jury for damages due to lost wages, benefits, and earning capacity incurred after his termination.

### A. *The FELA and RLA Frameworks*

#### 1.

■ Congress originally enacted the FELA in 1906 to create a federal remedy for railroad employees injured on the job by the negligence of their employers or their coworkers. *Atchison, T. & S.F. Ry. v. Buell*, 480 U.S. 557, 561, 107 S.Ct. 1410, 1413, 94

L.Ed.2d 563 (1987); *Lancaster v. Norfolk & Western Ry.*, 773 F.2d 807, 812 (7th Cir. 1985), *cert. denied*, 480 U.S. 945, 107 S.Ct. 1602, 94 L.Ed.2d 788 (1987). Independent of the railroad's obligations under its CBA, the FELA provides railroad workers not only with substantive protection against negligent conduct by the railroad, but also affords an injured worker a remedy suited to his needs, untrammeled by many traditional defenses against tort liability. *Buell*, 480 U.S. at 565, 107 S.Ct. at 1415. This statute thus serves to provide an injured worker with an expeditious recovery and also gives a railroad the incentive to maintain vigilance over the safety of its workers and, concomitantly, the conditions in which they must work. An injured railroad employee can recover under the FELA as long as the employer's negligence "played any part, even the slightest, in producing the injury ... for which damages are sought." *Rogers v. Missouri Pacific R.R.*, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957). Moreover, the FELA has also been interpreted to reach at least some intentional torts. *See Lancaster*, 773 F.2d at 812. The FELA is, therefore, a broad remedial statute to be construed liberally in order to effectuate its purpose. *Buell*, 480 U.S. at 562, 107 S.Ct. at 1414.

#### · 2.

■ The RLA was established to achieve an altogether different goal. Enacted in 1926, the RLA provides an extensive administrative framework for resolving labor disputes in the railroad industry. *Id.* Under the RLA, minor disputes—those involving "grievances that arise daily between employees and carriers regarding rates of pay, rules, and working conditions," i.e., disputes under the operative CBA—are to be resolved out of court. *See* 45 U.S.C. § 153 First (i). In this manner, Congress promoted stability in the railroad industry by creating a mandatory alternative to judicial resolution of railroad-employee disputes arising out of the interpretation of CBAs. *Union Pacific R.R. v. Sheehan*, 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978).

■ Pursuant to the RLA, a minor dispute must first be handled through the railroad's

usual internal dispute resolution procedures. This usually consists of an investigation held on the railroad's premises. If the dispute remains unsettled, a party may submit it to the National Railroad Adjustment Board (NRAB) or to a PLB (which is merely a smaller version of the NRAB and is frequently stipulated to by the parties in order to hasten dispute resolution, *see* 45 U.S.C. § 153 Second). *Buell,* 480 U.S. at 562–63, 107 S.Ct. at 1414. A PLB is composed of a labor member, a railroad member, and a neutral member and is essentially an arbitral tribunal that reviews the outcome of a railroad's investigative hearing to ascertain whether the result is consonant with the terms of the CBA between the railroad and its union employees. *See Elmore v. Chicago & I.M. Ry.,* 782 F.2d 94, 95 (7th Cir.1986); FRANK ELKOURI & EDNA A. ELKOURI, HOW ARBITRATION WORKS 304 (4th ed. 1985). A PLB award may be appealed in federal court, but the scope of judicial review is "among the narrowest known to the law." *Sheehan,* 439 U.S. at 91, 99 S.Ct. at 401; *see also American Train Dispatchers Ass'n v. Norfolk & Western Ry.,* 937 F.2d 365, 366 (7th Cir. 1991). "Judicial review of Board orders is limited to three specific grounds: (1) failure of the Board to comply with the requirements of the Railway Labor Act; (2) failure of the Board to confine itself to matters within the scope of its jurisdiction; and (3) fraud or corruption." *American Train Dispatchers,* 937 F.2d at 366 (citing 45 U.S.C. § 153 First (q)).

### 3.

Although the RLA was enacted many years after the FELA had been established, the text makes no mention of the FELA, *Buell,* 480 U.S. at 562, 107 S.Ct. at 1414, much less mention of any preclusive effect a PLB award might have on issues raised in a FELA claim. Moreover, there is no indication in the RLA that the FELA rights were in any way diluted by the enactment of the RLA. The RLA merely states that awards of the PLB "shall be final and binding upon both parties to the dispute." 45 U.S.C. § 153 First (m) and 153 Second. In discussing whether a worker's action for emotional injury should be considered a FELA claim or

should fall under the purview of the RLA, the Supreme Court has noted that "absent an intolerable conflict between the two statutes, we are unwilling to read the RLA as repealing any part of the FELA.... As far as a worker's right to damages under the FELA is concerned, Congress' enactment of the RLA has had no effect." *Buell,* 480 U.S. at 566–67, 107 S.Ct. at 1416; *see also Capraro v. United Parcel Serv. Co.,* 993 F.2d 328 (3d Cir.1993) (noting that the RLA does not preempt claims that may also be brought under the FELA).

As noted above, Mr. Kulavic does not contest the PLB's ultimate determination that he was not wrongfully terminated from his position as a C & IM carman. Thus, he acknowledges the finality and binding effect of the PLB's award. The district court, however, held that in reaching its result, the PLB implicitly considered and resolved the issues underlying Mr. Kulavic's discharge. Mem. Op. at 8. "This included whether at the time of his discharge, Kulavic was physically capable of preforming [sic] the duties of carman." *Id.* Because the district court believed that the PLB had implicitly found Mr. Kulavic healthy enough to continue his work as a carman, the court ruled that he could not present to the jury the question of whether he lost future income and benefits from his injuries. Submission of this matter to the jury would constitute, in the district court's view, a relitigation of the same issue in his FELA action. We must determine whether the court correctly gave preclusive effect to an issue purportedly resolved by the PLB.

### B. *Reconciliation of the Statutory Schemes*

#### 1.

█ PLB resolution of minor disputes is deemed "compulsory arbitration" for the limited field of the RLA. *See Brotherhood of R.R. Trainmen v. Chicago River & I. R.R.,* 353 U.S. 30, 39, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957). Thus, an award made by the PLB has the same finality as a decision made by arbitrators. *Gunther v. San Diego & A. Eastern Ry.,* 382 U.S. 257, 263, 86 S.Ct. 368, 371, 15 L.Ed.2d 308 (1965). The Supreme

Court has stated, as a general principle, that "it is far from certain that arbitration proceedings will have any preclusive effect on the litigation of nonarbitrable federal claims." *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 222, 105 S.Ct. 1238, 1243, 84 L.Ed.2d 158 (1985). It is the task of the courts to determine whether preclusive effect will be given a finding made in arbitration; this determination directly safeguards other federal interests. *Id.* at 223, 105 S.Ct. at 1243; *see also McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984). Thus, "in framing preclusion rules [in the context of arbitration,] courts shall take into account the federal interests warranting protection." *Dean Witter,* 470 U.S. at 223, 105 S.Ct. at 1244.

In several cases, the Supreme Court has refused to give arbitrated claims preclusive effect in subsequent judicial proceedings:

> This Court has, on numerous occasions, declined to hold that individual employees are, because of the availability of arbitration, barred from bringing claims under federal statutes. *See, e.g., McDonald v. West Branch,* 466 U.S. 284 [104 S.Ct. 1799, 80 L.Ed.2d 302] (1984); *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728 [101 S.Ct. 1437, 67 L.Ed.2d 641] (1981); *Alexander v. Gardner–Denver Co.,* 415 U.S. 36 [94 S.Ct. 1011, 39 L.Ed.2d 147] (1974). Although the analysis of the question under each statute is quite distinct, the theory running through these cases is that notwithstanding the strong policies encouraging arbitration "different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers." *Barrentine,* [450 U.S.] at 737 [101 S.Ct. at 1443].

*Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 411–12, 108 S.Ct. 1877, 1884, 100 L.Ed.2d 410 (1988) (quoting *Buell,* 480 U.S. at 564–65, 107 S.Ct. at 1415). In *McDonald,* the Court held that arbitration does not preclude a subsequent § 1983 action; *Barrentine* states that arbitration has no preclusive effect on a claim under the Fair Labor Standards Act; *Gardner–Denver* holds that arbi-

tration has no preclusive effect on a Title VII claim; and *Buell* states that the availability of an action under the RLA does not preclude the filing of a FELA claim.

In discussing this judicial reluctance to give preclusive effect to arbitration decisions, Justice Powell's opinion for the Court in *Alexander v. Gardner–Denver,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), set forth the considerations that were to surface repeatedly in subsequent cases. In *Gardner–Denver,* an employee, pursuant to a CBA, submitted his race discrimination claim to an arbitrator who rejected the employee's claims. The employee then brought suit in federal court under Title VII, in which he alleged that he had been discharged from his employment as a consequence of racially discriminatory employment practices. The Supreme Court held that the arbitrator's decision did not have preclusive effect in the Title VII action, despite the fact that the employee's claim was virtually the same in both actions. As part of its rationale for this holding, the Court noted that Title VII is an important congressionally created enforcement mechanism for remedying racial discrimination and that the federal courts have been given plenary power to enforce the statutory requirements. *Id.* at 47, 94 S.Ct. at 1019. The Court also emphasized a distinction between asserting contractual rights under a CBA and asserting independent, individually-based statutory rights accorded by Congress. *Id.* at 49–50, 94 S.Ct. at 1020. Thus, the Court based its rejection of preclusive effect, in large part, on its belief that Congress intended the statute to be judicially enforceable and that arbitration does not provide an adequate substitute for judicial proceedings in adjudicating claims under that statute.

The Court further emphasized that arbitration has a well-defined role in the "system of industrial self-government." *Id.* at 52, 94 S.Ct. at 1022 (footnote omitted).

> As the proctor of the bargain, the arbitrator's task is to effectuate the intent of the parties. His source of authority is the collective-bargaining agreement, and he must interpret and apply that agreement in accordance with the "industrial common

law of the shop" and the various needs and desires of the parties.

*Id.* at 53, 94 S.Ct. at 1022. Consequently, arbitral procedures, while well-suited to the resolution of arbitral disputes, make arbitration a comparatively inappropriate forum for the final resolution of rights created by Title VII. *Id.* at 56, 94 S.Ct. at 1023.

[T]he specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land.... Parties usually choose an arbitrator because they trust his knowledge and judgment concerning the demands and norms of industrial relations. On the other hand, the resolution of statutory or constitutional issues is a primary responsibility of courts....

*Id.* at 57, 94 S.Ct. at 1024.

Justice Powell also stated that

the factfinding process in arbitration usually is not equivalent to judicial factfinding. The record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath, are often severely limited or unavailable.

*Id.* at 57–58, 94 S.Ct. at 1024. He also noted that arbitrators are under no obligation to give reasons for their award. *Id.* at 58, 94 S.Ct. at 1024. Moreover, in the collective bargaining process, the manner and extent to which an individual grievance is presented and the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit. *Id.* at 58 n. 19, 94 S.Ct. at 1024 n. 19. Similar considerations guided the Court's determination in *Barrentine* with respect to the Fair Labor Standards Act. Again, in *McDonald,* the Court came to a similar conclusion when it held that § 1983 claims are important congressionally created and judicially enforceable statutory rights, and thus that arbitration does not provide an "adequate substitute for a judicial proceeding in protecting the federal statutory and constitutional rights that § 1983 is designed to safeguard." 466 U.S. at 290, 104 S.Ct. at 1803.

2.

We must now examine in some detail the procedures a PLB utilizes in reviewing a minor dispute and making a final award. We shall, of course, focus on the particular arbitration process at issue in this case.

■ Under the RLA, the PLB reviews a minor dispute only after the claim is first presented to the railroad pursuant to its usual reviewing procedures. 45 U.S.C. § 153 First (i). The RLA does not govern the procedures a railroad uses in its investigative hearing. *Edwards v. St. Louis–San Francisco R.R.,* 361 F.2d 946, 953 (7th Cir.1966). Instead, at this stage of a grievance claim, "the dispute is between private parties [the employee and the railroad] and the applicable procedure for settling the dispute is governed by the contract between them." *Id.* at 954. The rights available to an employee, therefore, are governed by the CBA and may vary from agreement to agreement; CBAs are not required to contain a standard set of guarantees for investigative hearings. For example, the employee does not necessarily have the right to be represented by an attorney during the proceedings. *Id.* In *Edwards,* this court stated that "[b]asically, all that is required of the initial conference on company property is that 'men of good faith must in good faith get together in a sincere effort to resolve their differences.'" *Id.* (quoting *Rutland Ry. v. Brotherhood of Locomotive Eng'rs,* 307 F.2d 21, 41 (2d Cir. 1962), *cert. denied,* 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963)). Of course, a CBA can provide for more stringent procedural guarantees.

C & IM's minor dispute procedure provides for an investigative hearing regarding Mr. Kulavic's work absence. The CBA between C & IM and Mr. Kulavic's union was not included by either party in the record on appeal; thus, we do not know what investigative procedures were guaranteed Mr. Kulavic. We do know, however, that, like most investigations of this nature, the hearing was held on the railroad's premises and was conducted by railroad officials. At Mr. Kulavic's hearing, the Hearing Officer was a superintendent of the railroad and the Interrogator was a chief engineer who at that time had

been employed by C & IM for fourteen years. R. 53, part 4 at 1. The parties agree that Mr. Kulavic did not have the right to be represented by counsel; a union official represented Mr. Kulavic. Furthermore, Mr. Kulavic contends that no discovery procedures were available to aid his preparation for the hearing and that, while he had the ability to cross-examine witnesses, he had no right to subpoena witnesses for either live or deposition testimony. Most importantly, he asserts that his employer, the railroad, was both judge and jury in the proceedings. Appellant's Br. at 11. A railroad official presided over the hearing and that same official both determined that Mr. Kulavic had breached the terms of his employment and disciplined him by terminating his employment with the railroad. *See* R. 54, part 5 (letter from Hearing Officer to Mr. Kulavic). C & IM does not dispute any of these assertions and thus the absence of the CBA in the record is not of critical concern.

The purpose of the investigative hearing was to determine whether Mr. Kulavic had breached the terms of the CBA by not reporting for work after he had been instructed to do so. The investigation centered on the medical evidence that Mr. Kulavic had provided to C & IM regarding his alleged inability to return to work. Much of the hearing was spent reading letters and medical opin-

ions into the record.[3] The railroad reiterated that its physician, Dr. Meyer, did not believe Mr. Kulavic had submitted sufficient medical evidence to show that he was unable to perform his duties as a carman, *see* R. 53, part 4 at 15; Dr. Meyer, however, did not appear at the hearing.

■ After Mr. Kulavic had submitted to the hearing, he was then able to appeal to a PLB. However, the PLB apparently does not review the railroad's investigatory proceedings de novo. Mr. Kulavic asserts that PLBs are

> the *only* stage of the disciplinary process not controlled by the railroad, [but they] do *not* provide a trial de novo to the aggrieved party, ... instead [they] act much like appellate courts in that their review is limited to the record made of the disciplinary proceedings conducted by the railroad at its "investigation."

Appellant's Br. at 10. At oral argument, Mr. Kulavic's counsel could point to no definitive statement in the RLA's text that mandates this type of review; however, C & IM did not take issue with this characterization of the review available from the PLB.

The extent of the PLB's review of an investigative hearing poses a difficult question.[4] In any event, it is unnecessary for us

3. Both parties made various objections during the course of the hearing, but we do not know what rules were the basis of these objections. Nor do we know the effect of such objections. As far as we can tell from the transcript of the investigation, the Hearing Officer's response to these objections was that the objections were a matter of record and would be given due consideration.

4. We have previously noted that it is not entirely clear that a PLB is limited to reviewing only the evidence presented in the investigative hearing, although we have acknowledged that arguably the introduction of new evidence is prohibited at the arbitral stage. *Brotherhood Ry. Carmen Div. v. Atchison, T. & S.F. Ry.,* 956 F.2d 156, 159 (7th Cir.1992). In further support of this proposition, one treatise on arbitration has stated that

> [i]f the arbitration tribunal is serving essentially in an appellate capacity there is obviously strong reason to confine the evidence to what was considered below. In this regard, the rules of the National Railroad Adjustment Board require that all data submitted in sup-

port of the party's position must affirmatively show the same to have been presented to the other party and made a part of the particular question in dispute.

FRANK ELKOURI & EDNA A. ELKOURI, HOW ARBITRATION WORKS 304 (4th ed. 1985) (citations omitted). Furthermore, we note that the regulations for the NRAB state that "all data submitted [to the Board] in support of [either the carrier's or the employee's] position must affirmatively show the same to have been presented [to the other party] and made a part of the particular question in dispute." 29 C.F.R. § 301.5(d) and (e).

As we stated in *Atchison,* it is particularly likely that a PLB is limited to reviewing the evidence presented in the "on premises" investigation. This is true because the RLA requires an employee to exhaust all of the usual grievance procedures before PLB review will be allowed.

> The requirement of exhaustion implies, in turn, that a party may not raise an issue, or present new evidence concerning an old issue, for the first time at the arbitration stage, for by doing so he would bypass the earlier stages and thus fail to exhaust the remedies provided at those stages.

to determine whether PLBs are generally restricted from considering evidence not previously presented at an investigative hearing, because Public Law Board No. 4284, the PLB that assessed Mr. Kulavic's appeal, clearly stated that it could not look beyond the record made at the investigative hearing. "[I]t is well settled in railroad disciplinary proceedings that the parties to the dispute and any Board having jurisdiction are limited to the evidence in the investigation, and such record may not properly be added to after the investigation closes." PLB award, R. 55, part 8 at 4–5. This PLB, therefore, did not look beyond the record established by railroad management in the investigative hearing and this fact must give us pause for concern.

Because the PLB here functioned as an appellate tribunal, it was limited to reviewing the record created in the railroad-controlled investigative hearing. Furthermore, C & IM does not dispute that the factfinding process utilized at the hearing was not equivalent to evidentiary procedures used in judicial factfinding. For these reasons, we do not believe that the PLB's review could protect adequately the statutory rights set forth in the FELA.

While the informality of an investigative hearing and circumscribed PLB review were intended to provide an expeditious alternative to lengthy court litigation for day-to-day minor labor disputes, these same procedures do not provide sufficient guarantees for reliable factfinding under the FELA. As we have noted earlier, this same rationale

formed part of the basis for the Supreme Court's decisions in *Gardner–Denver, Barrentine,* and *McDonald* which determined that arbitration prior to Title VII, FLSA, or § 1983 actions could not preclude the statutory actions.[5] In each case, the Court found that the procedures used in arbitral factfinding were insufficient to protect the important statutory and constitutional rights employees were seeking to enforce in subsequent judicial actions. In *Gardner–Denver,* the Supreme Court acknowledged that "it is the informality of arbitral procedure that enables it to function as an efficient, inexpensive, and expeditious means for dispute resolution. This same characteristic, however, makes arbitration a less appropriate forum for final resolution of Title VII issues than the federal courts." 415 U.S. at 58, 94 S.Ct. at 1024.

C & IM has the burden of establishing that res judicata or collateral estoppel ought to bar post-termination economic damages in the FELA action.[6] In this case, that burden has not been met. C & IM has not demonstrated that these procedures were sufficiently protective of Mr. Kulavic's federal statutory right to recover under the FELA.

### 3.

We find further support for our holding in a decision by the Second Circuit, *Coppinger v. Metro–North Commuter R.R.,* 861 F.2d 33 (2d Cir.1988). In *Coppinger,* a railroad employee was discharged after he tested positive for the presence of narcotics. He sought to have his termination rescinded through RLA arbitration proceedings; however, a

*Atchison,* 956 F.2d at 159. *But see Polewsky v. Bay Colony R.R.,* 799 F.Supp. 396, 400 (D.Vt. 1992). The *Polewsky* court held that NRAB review is not limited to evidence presented at a prior hearing because the RLA and the regulations provide that the Board is to be presented "with a full statement of the facts and all supporting data bearing upon the disputes." *Id.* (quoting 45 U.S.C. § 153 First (i); 29 C.F.R. § 301.2(a) (1992)). The court did not discuss the meaning of the language set forth in 29 C.F.R. § 301.5(d) and (e).

5. These cases deal with the question of whether arbitration can totally and definitively preclude judicial proceedings on the identical claim. By contrast, as C & IM acknowledges, Mr. Kulavic has a separate right to FELA damages and some of the elements of that claim were not addressed

by the PLB. Of course, the rationales of *Gardner–Denver, Barrentine, McDonald,* and also *Buell,* are equally applicable here in determining the adequacy of the fact-finding process to safeguard a separate substantive statutory claim.

6. *See Blonder–Tongue Labs., Inc. v. University of Ill. Found.,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) (stating that res judicata is an affirmative defense); *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.,* 914 F.2d 900, 906 (7th Cir.1990) (holding that party claiming collateral estoppel effect has the burden of proving its appropriateness); 18 Charles A. Wright et al., Federal Practice and Procedure § 4405 at 38 (1981) (stating that "the burden of establishing preclusion is placed on the party claiming it").

PLB upheld his dismissal. The employee then brought a § 1983 action in federal court, charging that the railroad had infringed his Fourth Amendment right to be free from unreasonable search and seizure, when it required him to provide blood and urine samples for the drug test. The railroad asserted that the employee had been given a full and fair opportunity to present his Fourth Amendment claim to the PLB and, thus, the arbitration proceedings should preclude any subsequent § 1983 action.

The Second Circuit refused to grant such preclusive effect. It determined that the legal and factual issues raised under the Fourth Amendment and § 1983 are arguably beyond the competence of arbitrators whose expertise primarily encompasses industrial relations and the interpretation of CBAs. Furthermore, the PLB's mandate is to interpret the CBA, not to enforce statutes. The court also stated that the arbitral procedures used by the PLB "are less protective of constitutional guarantees than are the procedures employed in the United States courts." [7] 861 F.2d at 39. Finally, the court held that granting preclusive effect in the § 1983 action would deny the employee the full range of relief that would otherwise be available to compensate him for the violation of his rights. Relief under the RLA for unjust dismissal would have been limited to reinstatement and back pay, whereas in the district court the employee would have all of the usual avenues of recovery available. "Hence, the remedies available in the arbitral forum, though effective for the resolution of 'minor disputes' under the collective bargaining agreement, are patently inadequate as a means of resolving appellant's constitutional claims under § 1983." *Id.* Acknowledging that the record did not indicate that the employee's constitutional claims had been considered or determined by the PLB, the court concluded that the arbitral decision by the PLB was not res judicata with respect to the district court action. *Id.*

In a subsequent case, *Benjamin v. Traffic Exec. Ass'n Eastern R.R.,* 869 F.2d 107 (2d Cir.1989), the Second Circuit determined that an arbitral finding (one apparently not made before a PLB) that employees were not rate bureau employees under the Staggers Act should be given preclusive effect on claims under RICO and for fraud and breach of fiduciary duty. Although the court discussed *Coppinger,* it found that the concerns expressed in that opinion were inapplicable to the circumstances in *Benjamin.* [8]

*Benjamin* explicitly left *Coppinger* undisturbed and therefore does not alter our analysis. The *Benjamin* court emphasized and specifically held that the employees had been given a full and fair opportunity to litigate before the arbitration board.[9] *Id.* at 110. Furthermore, the court relied heavily on the point that the issue reviewed in the arbitration, which was instituted after the commencement of judicial proceedings, was identical to the issue submitted to the court for de novo decision. Had the arbitral determi-

---

7. The court specifically noted that

> [a]rbitration does not carry with it the right to a trial by jury; arbitrators are not generally required to give the reasons for their decisions; the record of arbitral proceedings generally is not as complete as a trial record; judicial review of Board decisions is more limited than review of district court proceedings; the Federal Rules of Evidence and of Civil Procedure do not apply; and other rights such as testimony under oath, cross-examination, discovery, and compulsory process are restricted. In short, where suits are tried is often as important as the substantive rights sought to be vindicated.

*Coppinger,* 861 F.2d at 39.

8. Because we distinguish the two Second Circuit cases on these grounds, we need not decide whether we support the *Benjamin* court's analysis of the difference in preclusive effect between res judicata and collateral estoppel.

9. The court described the arbitration process as follows:

> Following commencement of this action, defendants moved to compel arbitration on the Staggers Act claim. The employees agreed to submit that count to binding arbitration on a classwide basis. Both parties set up informal procedural rules to govern the arbitration proceeding. They agreed to presentation of oral or written testimony, to extensive briefing and did, in fact, engage in informal discovery. At the hearing the plaintiffs cross-examined the defendants' witnesses who testified orally, and could have, if they had chosen, called in and cross-examined those witnesses who submitted their testimony on paper.

*Benjamin,* 869 F.2d at 109.

nation not been given preclusive effect, there was a danger of inconsistent results. Pursuant to the arbitration, the employees 'were found not to be rate bureau employees under the Staggers Act, but the possibility existed that if they were allowed to go to trial on the remaining claims, the factfinder could have found them to be rate bureau employees for the other three counts. This result, in the Second Circuit's view, would have been untenable. The court also found that the nature of the issue in front of the arbitrators— whether the employees were considered rate bureau employees under the Staggers Act— was closer to the arbitrators' realm of expertise than was the Fourth Amendment claim in *Coppinger.*

*Benjamin* is simply not controlling here. We have held already that the factfinding procedures used in Mr. Kulavic's case are inadequate to convince us that facts allegedly determined in the arbitration should be given preclusive effect in a FELA action. Focusing on the inadequacy of the arbitral procedures, when juxtaposed against the important statutory rights embodied in the FELA, we believe that the situations in *Coppinger* and this case are analogous.

10. This court has recently held that RICO claims premised on a railroad's alleged violation of its CBA are preempted by the RLA. *Underwood v. Venango River Corp.*, 995 F.2d 677 (7th Cir. 1993). Because the RICO claims "depended solely upon an interpretation of the rights created in the collective-bargaining agreement," we stated that the action would not vindicate substantive rights independent from the CBA. 995 F.2d at 685. Thus, the RLA controlled. This is not the case, however, with Mr. Kulavic's FELA claim. As we earlier noted, the FELA does provide for substantive statutory rights independent of the RLA. Interpretation of the CBA is not required to construe those rights.

11. As C & IM acknowledged at oral argument, the ultimate determination by the PLB was that the railroad had appropriately terminated Mr. Kulavic's employment; in other words, the investigative hearing had not been improper or fraudulent. The underlying rationale of the PLB's award seems to be that Mr. Kulavic did not provide sufficient medical evidence to excuse his failure to return to work when instructed to do so by C & IM, thereby breaching the provisions of the CBA and allowing the railroad justifiably to terminate his employment. The award states that

4.

Finally, we note that, while arising in a different context than the case before us, the Supreme Court's analysis in its recent decision in *Astoria Federal Savings & Loan Association v. Solimino*, —— U.S. ——, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991), confirms the correctness of the methodology we have employed. In that case, which dealt with the circumstances in which the decision of an administrative tribunal—not an arbitration proceeding—ought to be recognized in later judicial proceedings, the Court first noted that the matter of issue preclusion is, fundamentally, a matter of legislative intent. That legislative intent can be discerned only by an examination of "the specific context of the rights at stake, the power of the agency, and the relative adequacy of agency procedures." —— U.S. at ——, 111 S.Ct. at 2170.

As we have previously noted, there is no indication that Congress intended to subordinate the rights created by FELA to the strictures of the RLA.[10] Moreover, the task of the PLB was limited to application of the CBA. Indeed, it is not at all clear that the issue determined by the PLB was even the same issue as the damages issue presented to the district court in the FELA action.[11]

[t]here was no evidence presented in the investigation that claimant was being withheld from Carrier's service by any doctor. It is clear from the record that claimant was attempting to substitute his personal opinion as to his ability to return to work for the professional opinions of the several medical doctors involved.

R. 55, part 8 at 4. In this litigation, however, C & IM asserts that the focal point of the award was Mr. Kulavic's physical ability to perform the duties of his former job. The railroad contends that the PLB, after reviewing the medical documents presented to it, determined that Mr. Kulavic was physically fit to return to work and that, the PLB ruled out any possibility that he is entitled to future wages and benefits from the date of his discharge as recompense for his alleged injuries. Nowhere in its award, however, does the PLB specifically state that it has determined Mr. Kulavic to be physically able to perform his former duties. Although the district court was persuaded by C & IM's interpretation of the award, we believe the matter is far from clear. The language can just as easily be read to support the contention that Mr. Kulavic simply failed to present sufficient medical evidence to the railroad as required under the CBA, choosing

Finally, as we have already noted, the procedures of the PLB are not an adequate substitute for the factfinding processes of the district court. In short, while this case involves the preclusive effect of an arbitration award, as opposed to an administrative decision, we have walked an analytical path compatible with the one followed by the Court in *Astoria Federal.*

### Conclusion

The arbitral award by the PLB should not have been given preclusive effect in Mr. Kulavic's subsequent FELA action. In his prayer for relief, Mr. Kulavic requested a new trial only on the issue of damages. Because the trial was bifurcated into a liability phase and a damages phase, this relief is appropriate. Furthermore, because we are resolving the case in this manner, C & IM's cross-appeal regarding alleged evidentiary errors in the damages phase of trial is moot. Any resolution of those claims on appeal would be advisory. For the foregoing reasons, we reverse the ruling of the district court regarding the preclusive effect of the PLB award, remand for a new trial on damages in accordance with this opinion, and dismiss C & IM's claims on cross-appeal. Mr. Kulavic may recover his costs in this court.

REVERSED AND REMANDED AND CROSS-APPEAL DISMISSED.

FLAUM, Circuit Judge, concurring.

This case poses a rather tricky question of issue preclusion. The court's opinion represents a very thorough elaboration of the relative scope and purposes of the FELA and the RLA as well as the particular tension between the two statutes with regard to Kulavic's claim. At the most basic level, neither party disputes that Kulavic was entitled to recover damages under the FELA for the harm he suffered at the hands of his supervisor. *See Lancaster v. Norfolk and Western Ry. Co.,* 773 F.2d 807, 814–15 (7th Cir.1985), *cert. denied,* 480 U.S. 945, 107 S.Ct. 1602, 94 L.Ed.2d 788 (1987). His supervisor's con-

duct that precipitated Kulavic's injuries constitute an unauthorized touching of him and, although intentional rather than negligent, nevertheless fall within the bounds of the FELA. The principal question then is whether Kulavic is entitled to seek all the damages to which he maintains he is entitled.

In his complaint, Kulavic claimed a right to recover for disability from his injury, pain and suffering, medical expenses, lost earnings, and loss of earning capacity and fringe benefits. Chicago & Illinois Midland Railway Company ("C & IM") contested only whether he has the right to present evidence to the jury of any wages or earning capacity or fringe benefits lost after it terminated him. Thus, the district court's denying Kulavic the right to offer evidence of any losses after his discharge did not totally deprive him of his FELA claim but merely circumscribed it in a fairly limited way (assuming that pain and suffering constitutes the major component of a personal injury claim).

To determine whether Kulavic can present evidence on his post-termination damages, the court's opinion carefully retraces the sometimes blurry line between the RLA and the FELA. For example, *Atchison, Topeka and Santa Fe Ry. Co. v. Buell,* 480 U.S. 557, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987), contains some rather expansive language regarding the types of negligence claims by railroad employees that may be brought under the FELA. Apparently taking *Buell's* lead, the court reasons that because the RLA does not preempt FELA actions, a PLB order arrived at through RLA arbitration procedures does not have any preclusive effect on a FELA action. Analogizing from cases such as *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), and *Coppinger v. Metro–North Commuter Railroad,* 861 F.2d 33 (2d Cir.1988), the court maintains that the nature of the grievance process

---

instead to rely unjustifiably on his own opinion as evidence to convince his employer that he was

physically unable to return to work.

and the PLB arbitration "[does] not provide an adequate substitute for judicial proceedings in adjudicating claims under that statute." Op. at 514. Certainly, no one would dispute that an arbitration panel is ill-equipped to consider certain types of claims, particularly those falling outside the range of claims stemming from minor breaches of collective bargaining contracts. Accordingly, arbitration would not be a proper method for adjudicating an employee's Title VII or section 1983 claims.

On the present facts, however, I believe that the damages claimed by Kulavic do not fall unequivocally outside of the RLA regime for resolving workplace grievances. In this regard, I find *Benjamin v. Traffic Executive Ass'n Eastern Railroads*, 869 F.2d 107 (2d Cir.1989), to be more germane than *Coppinger*. For Kulavic to assert his personal injury claim in court under the FELA and avoid the preclusive effect of the RLA, his claim must, as a preliminary matter, be based on a specific provision of FELA, that is, Congress must have intended that such actions be litigated in FELA suits.[1] *See Jackson v. Consolidated Rail Corp.*, 717 F.2d 1045, 1050 (7th Cir.1983). The language of the FELA on which Kulavic is relying provides:

> Every ... railroad ... shall be liable in damages to any person suffering injury while he is employed by any such carrier in such commerce ... for such injury or death resulting in whole or in part from the negligence of the officers, agents, or employees of such carrier.

45 U.S.C. § 51 (1986). At first glance, his damages action falls squarely within this provision. However, a somewhat different characterization of Kulavic's action does suggest that the FELA may not be broad enough to accommodate him in recovering all the damages he seeks. One could properly regard his claims for lost wages and fringe benefits as discharge-related claims. And an extremely literal reading of this FELA provision may allow recovery only for injuries that accrued during the tenure of the employee with a given carrier. Because any lost wages

and benefits precluded by the district court accrued after Kulavic's termination, he would not be able to pin them on this (or any other) statutory provision in the FELA. Kulavic would probably respond that even those damages can be traced back to the original altercation with his supervisor; moreover, the PLB did not literally address whether he was entitled to these post-discharge wages or fringe benefits during its termination hearing. It resolved only whether the discharge of Kulavic was lawful. Accordingly, I believe that the only issue relevant to this court's review should be the estoppel effect of Kulavic's termination, the legitimacy of which he did not challenge earlier and should not be able to challenge now. In this regard, I would focus not on the competence of those administering the termination hearing, itself the subject of collective bargaining, or the PLB, an entity sanctioned by Congress under the RLA, *see* 45 U.S.C. § 153 (1986), but on the reach of their conclusions.

One of the goals of issue preclusion is to put to rest those matters that a party has had an "full and fair opportunity to litigate." *See Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328, 91 S.Ct. 1434, 1442, 28 L.Ed.2d 788 (1971). Kulavic contends that because the factfinding by the PLB is distinct from, if not inferior to, judicial factfinding, the PLB termination decision should not have preclusive effect on the post-discharge losses. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 n. 15, 99 S.Ct. 645, 655 n. 15, 58 L.Ed.2d 552 (1979) ("differences in available procedures may sometimes justify not allowing a prior judgment to have estoppel effect in a subsequent action even between the same parties"). More to the point, despite a possible overlap in the evidence reviewed by the PLB and that which Kulavic would present in federal court, the PLB did not have occasion to consider his future economic damages.

In terminating Kulavic, the PLB deemed that he was fit to return to work. Any demands by Kulavic for post-discharge

1. Whether estoppel of certain damages claims by means of the PLB's decision to uphold Kulavic's termination "is intended by the legislature" is another way of asking whether Congress intended for such claims to be brought under the FELA. *See Astoria Federal Sav. & Loan Ass'n v. Solimino*, — U.S. —, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991).

wages and benefits appear then to be unwarranted because those items in essence represent the remedial elements of a wrongful discharge claim (minus reinstatement), which would properly fall within the strictures of the RLA and the purview of the PLB. *Cf. Morrissette v. Chicago, Burlington & Quincy R.R. Co.*, 299 F.2d 502 (7th Cir.1961), *cert. denied,* 369 U.S. 874, 82 S.Ct. 1141, 8 L.Ed.2d 277 (1962). I am not inclined to permit Kulavic to reopen or to circumvent the discharge proceedings, particularly if he was just balking at returning to the railyard. In my opinion, allowing a jury to hear evidence on whether Kulavic is entitled to post-termination lost wages and fringe benefits would be an end run around the finality of his termination, which is contrary to a very basic purpose of collateral estoppel. On the other hand, an employee's claim for the loss of future earning capacity is not dependent on that employee's present or previous employment circumstances. *See, e.g., Wiles v. New York, Central & St. Louis R.R.*, 283 F.2d 328 (3d Cir.), *cert. denied,* 364 U.S. 900, 81 S.Ct. 232, 5 L.Ed.2d 193 (1960); *see generally McKnight v. General Motors Corp.*, 973 F.2d 1366 (7th Cir.1992); *Wolkenhauer v. Smith,* 822 F.2d 711 (7th Cir.1987). Because the issue of Kulavic's lost earning capacity falls outside the scope of the PLB termination decision, I would limit remand to the district court for a new trial solely on the issue of future economic damages, excluding any consideration of lost wages and fringe benefits subsequent to his discharge from C & IM.[2]

---

2. Finally, I would note that although the court dismissed C & IM's cross appeal on its right to set off against the FELA judgment, the availability of set off to C & IM is not in dispute. *See* 45 U.S.C. § 55, *Burlington Northern R.R. Co. v. Strong,* 907 F.2d 707 (7th Cir.1990).

